## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CURTIS HUDSON FREEMAN,** | : | **CIVIL ACTION NO. 3:13-CV-00065** |
| | : | |
| **Plaintiff,** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **COMMISSIONER OF SOCIAL** | : | |
| **SECURITY,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM

The above-captioned action seeks review of the Commissioner of Social Security's ("Commissioner") decision denying plaintiff Curtis Hudson Freeman's ("Freeman") claim for disability insurance benefits and supplemental security income. Presently before the court is Freeman's appeal from an administrative law judge's ("ALJ") decision upholding the denial of social security benefits. (Doc. 1). For the reasons that follow, the court will remand the above-captioned matter to the ALJ for further proceedings.

I.    **Factual Background and Procedural History**

Plaintiff Curtis Hudson Freeman was born on March 18, 1969, and he was 39

years old on his disability onset date.[1] (Doc. 8-2 at 20, 25, 37).[2] Freeman currently

lives with his mother. (Id. at 60). He has a high school education and earned a

certificate for medical coding and billing. (Id. at 25, 38).

On March 18, 2011, Freeman protectively[3] filed an initial application for

disability insurance benefits ("DIB")[4] and supplemental security income ("SSI"),[5]

---

[1] At all times relevant to this matter, Freeman was considered a "younger
individual," whose age would not seriously impact his ability to adjust to other
work. (Doc. 8-2 at 25); see 20 C.F.R. §§ 404.1563(c), 416.963(c); see also 20 C.F.R., pt.
404, subpt. P, app. 2, § 201(h)(1) ("The term younger individual is used to denote an
individual 18 through 49.").

[2] Citations to the administrative record (Doc. 8) reflect the docket number
followed by the specific Bates-stamped page number on the bottom right-hand
corner of each page of the record.

[3] A protective filing typically occurs when an individual initially contacts the
Social Security Administration to file a claim for benefits and requests an expedited
filing date. Simply stated, it allows an individual to have an application date based
upon the date of his or her first contact with the Administration.

[4] Disability insurance benefits are paid to an individual if that individual is
disabled and "insured," that is, the individual has worked long enough and paid
social security taxes. See 42 U.S.C. §§ 415(a), 416(i)(1). The last date that an
individual meets the requirements of being insured is commonly referred to as the
"date last insured." See id. § 416(i)(2). The ALJ held that Freeman met the insured
status requirements through March 31, 2012. (Doc. 8-2 at 14, 16). In order to
establish entitlement to disability insurance benefits, Freeman is required to prove
that he suffered from a disability on or before March 31, 2012. 20 C.F.R. §404.131;
see also Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

[5] Supplemental security income is a federal income supplement program
funded by general tax revenues, not social security taxes. See 42 U.S.C. § 1381. It is
designed to help the aged, blind, or disabled individuals who have little or no
income. See id. § 1381a. Insured status is irrelevant to an individual's eligibility for

alleging disability since April 30, 2008.  (Id. at 14).  The Commissioner denied his

initial application for social security benefits on August 11, 2011.  (Id.)  Freeman

subsequently filed a written request for a hearing.  (Id.)  On June 4, 2012, Freeman

appeared with counsel and testified in Harrisburg, Pennsylvania at a video hearing

conducted by an ALJ in Chicago, Illinois.  (Id.)

Freeman alleges disability based upon degenerative disc disease of the neck

and back, degenerative joint disease of the left knee, depression, anxiety, and

migraines.  (Id. at 37).  At the hearing, Freeman testified that he has held mostly

management positions for the past fifteen years.  (Id. at 38-40).  Freeman's previous

positions include grocery store manager, office manager, medical billing manager,

dispatch supervisor, and outreach field representative.  (Id. at 38).  In 2010,

Freeman was employed part-time as a receptionist in the apartment building where

he lived for about two to three months.  (Id. at 42-43).  For approximately five

weeks, Freeman also worked for a company owned by his friends one hour a day

making deposits at the bank.  (Id. at 43-44).  Apparently, Freeman was paid for fifty

hours a week even though he only worked one hour a day.  (Id. at 77-78).  Finally,

Freeman worked for The Melting Pot restaurant for one day as a prep cook and

dishwasher, but he could not return to work due to his back problems.  (Id. at 45).

With respect to his physical impairments, Freeman testified that he first had

intense pain in his neck and eventually had surgery on his cervical spine in 2011.

---

supplemental security income benefits.  See id. § 1382.

(Id. at 46-47).  Freeman alleges that his neck problems have worsened since the surgery.  (Id. at 47).  He has difficulty turning his head and experiences sharp, stabbing pain radiating down both arms and hands, with the left side worse than the right side.  (Id. at 47-48).  As a result of the pain in his upper extremities, Freeman also has difficulty reaching overhead as well as some difficulty reaching and grasping objects in front of him or to his side.  (Id. at 48-50).  Moreover, Freeman cannot lift anything over five pounds and uses special software that converts speech into typing in order to operate a computer.  (Id. at 49-51).

Freeman further testified that he has bulging and herniated disks in his back, but he fears that another spinal surgery will make his back problems worse.  (Id. at 51).  Due to his back problems, Freeman cannot sit for more than ten to twenty minutes, stand for more than five or ten minutes without support, or walk more than 100 feet.  (Id. at 51, 53-54).  He has fallen several times because his legs give out from pain extending from his lower back into both legs, with his left side worse than his right side.  (Id. at 52-53).

Freeman also reported that he has had operations on both of his knees.  (Id. at 53-54).  Freeman had surgery on his right knee in 2006 after a fall and on his left knee for a meniscus tear from an automobile accident in 2008.  (Id. at 53).  He noted that he still has a burning sensation in his knee joints, and his knees sometimes lock up and cause him to fall.  (Id. at 54-55).

In addition to his physical impairments, Freeman suffers from depression and anxiety.  (Id. at 55).  He takes medication to control his symptoms and sees a

4

psychiatrist once a month and a therapist two or three times per week.  (Id.)
However, the main symptom Freeman noted is excessive sleepiness due to his
medications.  (Id. at 56-57).  Freeman also reported thoughts about self-harming,
lack of appetite, and crying every day.  (Id. at 56-57, 60).  In 2009, he was
hospitalized for a suicide attempt using alcohol and prescription medication.  (Id. at
89-90).  While Freeman was incarcerated for fraudulent checks, he was on suicide
watch because he did not take his medication.  (Id. at 67-68, 90).  Freeman also
stated that he experiences panic attacks five times a week, often from crowds of
more than seven or eight people, and it usually takes him ten to thirty minutes to
calm down.  (Id. at 58-60).  Lastly, Freeman indicated that he suffers from migraines
two to three times a day and becomes ill and sensitive to light.  (Id. at 72-73).

On a day-to-day basis, Freeman testified that he requires his mother's
assistance for most household chores, such as washing laundry, making his bed,
and running errands.  (Id. at 62-66).  Freeman also reported that he gets confused
and lacks the stamina and focus for basic activities.  (Id. at 70-72).  Although his
medical records indicate alcohol, marijuana, and prescription medication abuse,
Freeman denies any problems with substance abuse.  (Id. at 41, 79-80).

On August 17, 2012, the ALJ issued a decision denying Freeman's claim for
social security benefits.  (See id. at 11-32).  Freeman appealed the ALJ's decision to
the Appeals Counsel on September 4, 2012, (see id. at 7-10), and the Appeals
Counsel denied the appeal on November 23, 2012.  (See id. at 1-6).

On January 10, 2013, Freeman filed a *pro se* complaint in the instant action to appeal the final administrative decision denying his application for social security benefits pursuant to 42 U.S.C. §1383(c)(3).[6]  (Doc. 1).  On March 18, 2013, the Commissioner filed an answer (Doc. 7) to Freeman's complaint and provided the administrative record for the court's review.  (Doc. 8).  Upon further briefing by the parties, the instant action is ripe for disposition.  (See Docs. 9, 10, 11).

## II.   Standard of Review

In reviewing a social security appeal, the court may conduct a plenary review of all legal issues decided by the Commissioner.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  The court's review of findings of fact pursuant to 42 U.S.C. § 405(g), however, is limited to determining whether the findings are supported by "substantial evidence."  42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008);

---

[6] "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title."  42 U.S.C. §1383(c)(3).  "Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision . . . . Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business."  Id. § 405(g).  Under the Local Rules for the U.S. District Court for the Middle District of Pennsylvania, "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." L.R. 83.40.1.

Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. § 405(g); Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005) (stating that courts may not weigh the evidence or substitute its own conclusion for those of the fact-finder); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.").

Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 564-65 (1988) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson, 529 F.3d at 200; Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). The Third Circuit has described substantial evidence as more than a mere scintilla, but substantial evidence may be less than a preponderance of the evidence. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

7

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971).  "When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999) (quoting <u>Mason v. Shalala</u>, 994 F.2d 1058, 1066 (3d Cir. 1993)).  The ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 121 (3d Cir. 2000); <u>Cotter</u>, 642 F.2d at 706-07.  Therefore, the court must scrutinize the record as a whole on appeal.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## III.   <u>Sequential Evaluation Process</u>

To receive disability benefits, a plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is incapable of engaging in "substantial gainful activity" when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy." Id.

§ 423(d)(2)(A).

An ALJ utilizes a five-step sequential evaluation process in reviewing DIB

and SSI claims. 20 C.F.R. §§ 404.1520(a), 416.920(a). This process requires the ALJ

to consider, in sequence, whether the plaintiff (1) is engaging in "substantial gainful

activity,"[7] (2) has an impairment, or combination of impairments, that is "severe,"[8]

(3) has an impairment, or combination of impairments, that meets or equals the

requirements of a "listed impairment,"[9] (4) has the "residual functional capacity" to

---

[7] "Substantial gainful activity" is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. §§ 404.1510, 416.910. If the plaintiff is engaging in substantial gainful activity, the plaintiff is not disabled and the court need not proceed further with the sequential evaluation. Id. §§ 404.1520(b), 416.920(b).

[8] A "severe" impairment significantly limits a plaintiff's physical or mental ability to perform basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Basic physical work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, stoop, crouch, and handle. Id. §§ 404.1545(b), 416.945(b). An individual's basic mental or non-exertional activities include the ability to understand, carry out and remember simple instructions, and to respond appropriately to supervision, coworkers and work pressures in a work setting. Id. §§ 404.1545(c), 416.945(c). If the plaintiff does not have any severe impairment, or a combination of impairments which is severe, that has lasted or is expected to last for a continuous period of at least twelve (12) months, the plaintiff is not disabled and the sequential evaluation ends at this step. Id. §§ 404.1509, 404.1520(c), 416.909, 416.920(c). Regardless of the ALJ's conclusion, all medically determinable impairments, whether severe or non-severe, are considered in the subsequent steps of the sequential evaluation process. Id. §§ 404.1523, 404.1545(a)(2), 416.923, 416.945(a)(2).

[9] A "listed impairment" is one that appears on the Commissioner's Listing of Impairments, which is "a list of impairments presumed severe enough to preclude any gainful work." Sullivan v. Zebley, 493 U.S. 521, 525 (1990); see 20 C.F.R. pt. 404, subpt. P, app. 1. If the plaintiff has an impairment, or combination of impairments, that meets or equals a listed impairment, the plaintiff is disabled. 20 C.F.R.

return to his or her past work,[10] and (5) if not, whether he or she can perform other work in the national economy.  Id. §§ 404.1520(a), 416.920(a).  The burden of proof rests upon the plaintiff through the first four steps, and if the plaintiff is successful, then the burden of proof shifts to the Commissioner on the fifth and final step.  Mason, 994 F.2d at 1064.

Prior to addressing step four, the ALJ must determine the plaintiff's residual functional capacity.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Residual functional capacity ("RFC") is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, meaning a full-time schedule such as eight hours a day, five days per week.  See SSR 96–8p, 61 Fed. Reg. 34475 (July 2, 1996).[11]  The ALJ's RFC assessment must include a discussion of the individual's abilities.  20 C.F.R. §§ 404.1545, 416.945; SSR 96–8p; see Fargnoli, 247 F.3d at 40 (defining residual functional capacity as that

---

§§ 404.1520(d), 416.920(d).  Otherwise, the sequential evaluation proceeds to the next step.  Id. §§ 404.1520(e), 416.920(e).

[10] If the plaintiff has the residual functional capacity to do his or her past relevant work, the plaintiff is not disabled and the sequential evaluation ends.  Id. §§ 404.1520(f), 416.920(f).

[11] Social Security Rulings ("SSR") constitute the Social Security Administration's interpretations of the Social Security Act and its own regulations.  See Molina v. Astrue, 674 F.3d 1104, 1113 n.5 (9th Cir. 2012); Lauer v. Apfel, 169 F.3d 489, 492 (7th Cir. 1999).  SSRs do not have the force of law; nevertheless, once published, they are binding on the Social Security Administration.  Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); Boone v. Barnhart, 353 F.3d 203, 210 n.16 (3d Cir. 2003); 20 C.F.R. § 402.35(b)(1).

which an individual is still able to do despite the limitations caused by his or her impairments).

In the case *sub judice*, the ALJ applied the sequential evaluation process and, at step one, concluded that Freeman engaged in substantial gainful activity in 2008 and 2010 after the alleged disability onset date.  (Doc. 8-2 at 16).  However, the ALJ proceeded to the next step because he is required to evaluate Freeman's disability claims for the entire period of alleged disability.  (Id. at 17).

At step two, the ALJ found that Freeman has the following severe impairments: degenerative disc disease, left knee medial meniscus tear with surgery, migraines, anxiety, and depression.  (Id.)

At step three, the ALJ held that Freeman's physical impairments do not meet or medically equal listing 1.02 for major dysfunction of a joint due to any cause or listing 1.04 for disorders of the spine.  (Id.)  The ALJ also found that Freeman's mental impairments, whether considered separately or in combination, do not meet or equal any listed impairments.  (Id.)  Specifically, the ALJ determined that Freeman does not satisfy the "paragraph B" and "paragraph C" criteria of listings 12.04 for affective disorders and 12.06 for anxiety-related disorders.  (Id. at 17-19).

At step four, the ALJ found that Freeman retains the residual functional capacity to perform a modified range of light, unskilled work with some non-exertional limitations.  (Id. at 19).  Freeman cannot lift more than ten pounds, and he can never climb ladders, ropes, and scaffolds, or engage in reaching overhead with the upper extremities bilaterally.  (Id. at 19, 22).  Freeman can frequently reach

11

in all other directions, and he can frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs.  (Id.)  He also retains the ability to understand, remember, and carry out simple instructions and perform simple tasks.  (Id. at 19, 23).  Freeman must avoid concentrated exposure to hazards, such as unprotected heights and dangerous machinery, and he can have only occasional interaction with the public, co-workers, and supervisors.  (Id. at 19, 22, 23).  Based on the RFC assessment and a vocational expert's testimony, the ALJ concluded that Freeman can no longer perform his prior relevant work.  (Id. at 24-25).

At step five, however, the ALJ determined that Freeman can still perform light, sedentary, unskilled jobs, such as eyeglass assembler, circuit board tester, or sorter, and that there are a significant number of such jobs in the local and national economies.  (Id. at 25-26).  As a result of the five-step sequential evaluation process, the ALJ concluded that Freeman has not been disabled since April 30, 2008 under the Social Security Act.  (Id. at 26).

## IV.   Discussion

In the instant action, Freeman, who is proceeding *pro se*, requests that the court reverse or remand his disability claim to the ALJ for further proceedings for two main reasons.  First, the ALJ did not follow the applicable procedures at steps two and three for evaluating whether Freeman has severe mental impairments that meet or equal any listed impairments.  (Doc. 9 at 3).  Second, substantial evidence does not support the ALJ's RFC assessment at step four because the ALJ improperly discounted medical opinions and substituted his own lay opinion.  (Id.

12

at 2). Relatedly, the ALJ failed to develop a full and fair administrative record prior to making his RFC assessment. (Id.) The court will address these arguments *seriatim*.

### A.      Procedure for Assessing Mental Impairments

Freeman first argues that the ALJ failed to comply with the procedures in the social security regulations when he evaluated the severity of Freeman's mental impairments at steps two and three of the sequential evaluation process. (Doc. 9 at 3). 20 C.F.R. §§ 404.1520a and 416.920a set forth a special two-step procedure for assessing the severity of a plaintiff's mental impairments. 20 C.F.R. §§ 404.1520a(b), 416.920a(b). First, the ALJ must evaluate the symptoms, signs, and laboratory findings in the record to determine whether the plaintiff has medically determinable mental impairments. Id. §§ 404.1520a(b)(1), 416.920a(b)(1). Second, the ALJ must rate the degree of the plaintiff's functional limitations resulting from the mental impairments in the following areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. Id. §§ 404.1520a(b)(2), (c), 416.920a(b)(2), (c). If the ALJ rates the plaintiff's limitations in the first three functional areas as "none" or "mild," and "none" in the fourth area, the ALJ will conclude that the alleged mental impairment is not severe. Id. §§ 404.1520a(d)(1), 416.920a(d)(1). If the plaintiff has severe mental impairments, the ALJ will then determine whether the plaintiff's impairments meet or equal the severity of any listed impairment. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

The social security regulations also set forth the standard for proper documentation of the special technique at steps two and three of the sequential evaluation process.  Id. §§ 404.1520a(e), 416.920a(e).  When an ALJ or the Appeals Council makes a determination regarding the severity of mental impairments, "the written decision must incorporate the pertinent findings and conclusions based on the technique."  Id. §§ 404.1520a(e)(4), 416.920a(e)(4).  In particular, the written decision must contain the plaintiff's significant history, including medical evidence, and each functional limitation that was considered in the final decision.  Id.  The ALJ also must make specific findings as to the degree of limitation in each of the four functional areas.  Id.

Applying this procedure, the ALJ concluded at step two that Freeman's depression and anxiety constitute medically determinable mental impairments. (Doc. 8-2 at 17).  The ALJ then explicitly stated that he would discuss the medical evidence and limitations from Freeman's mental impairments in conjunction with the step three analysis.  (Id.)

Turning to step three, the ALJ assessed Freeman's mental impairments under listing 12.04 for affective disorders and listing 12.06 for anxiety-related disorders.  (Id.)  Listings 12.04 and 12.06 each have paragraph "A", "B", and "C" criteria.  See 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06.  An impairment meets listing 12.04 when the requirements in "paragraph A" and "paragraph B" are satisfied, or when the requirements in "paragraph C" are satisfied.  Id. § 12.04.  An impairment meets listing 12.06 when the criteria in both "paragraph A" and

14

"paragraph B" are satisfied, or when the criteria in both "paragraph B" and "paragraph C" are satisfied.[12]  Id. § 12.06.

The "paragraph B" criteria are identical for listings 12.04 and 12.06 and mirror the second step of the special technique for assessing mental impairments. To satisfy the "paragraph B" criteria, a plaintiff's mental impairments must result in at least two of the following: (1) marked[13] restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each for an extended duration.[14]  Id. §§ 12.04, 12.06.

The ALJ found that Freeman's mental impairments only cause mild to moderate functional limitations.  (Doc. 8-2 at 18).  First, the ALJ determined that Freeman has mild restrictions in daily living activities.  (Id.)  Although Freeman reported difficulties with meal preparation and household chores, he testified at the hearing that his limitations were caused by chronic pain, not any mental impairment.  (Id.)  Freeman also indicated in his function report and consultative

---

[12] The court need not address the "paragraph A" requirements because the ALJ held that Freeman's mental impairments do not satisfy the "paragraph B" and "paragraph C" requirements for listings 12.04 and 12.06.  (Doc. 8-2 at 18-19).

[13] A "marked" limitation means more than moderate, but less than extreme. 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C).

[14] "Repeated episodes of decompensation, each for an extended duration" means three episodes within one year, or an average of once every four months, each lasting for at least two weeks.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(4).

examination that he was able to cook simple meals, clean, shop, take care of his personal needs, and manage funds competently.  (Id.)

Second, the ALJ found that Freeman has moderate difficulties with social functioning.  (Id.)  Although Freeman lives with his mother, he has a history of isolation and anti-social behavior.  (Id.)  However, Freeman did not report any significant difficulties getting along with others in his past jobs.  (Id.)  Dr. Laguna also stated that Freeman was polite and cooperative during his consultative examination.  (Id.)

Third, with respect to concentration, persistence, and pace, the ALJ concluded that Freeman has moderate difficulties because Freeman reported poor memory and difficulty with understanding and following directions.  (Id.)  At the consultative examination, Dr. Laguna also noted Freeman's difficulty with concentration and focus, but he attributed these limitations to overmedication.  (Id.)  Moreover, Freeman retained a fair capacity to calculate simple math, think abstractly, and intact memory.  (Id.)

Finally, the ALJ found that Freeman has not experienced any episodes of decompensation for an extended duration.  (Id.)

Regarding the "paragraph C" criteria, listing 12.04 requires that a plaintiff demonstrate one of the following: (1) repeated episodes of decompensation for an extended duration, (2) a residual disease process that has resulted in such marginal adjustment that a minimal increase in mental demand or change in environment

would be predicted to cause decompensation, or (3) a current history of inability to function outside a highly supportive living arrangement for one or more years with an indication of continued need for such an arrangement.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04.  For listing 12.06, "paragraph C" requires that the plaintiff have a complete inability to function independently outside the area of her home.  Id. § 12.06.

In his administrative decision, the ALJ stated that there is no indication in the record that Freeman has repeated and extended episodes of decompensation, a residual disease process, or a current history of one or more year's inability to function outside a highly supportive living arrangement.  (Doc. 8-2 at 18-19).  Therefore, the ALJ held that Freeman fails to meet both the "paragraph B" and "paragraph C" requirements for listings 12.04 and 12.06.  (Id.)

Upon review of the record, the court finds that the ALJ clearly followed the special technique in assessing Freeman's mental impairments.  At step two, the ALJ properly concluded that Freeman has severe depression and anxiety because the ALJ found that Freeman has more than mild limitations in social functioning and concentration, persistence, or pace.  At step three, the ALJ detailed Freeman's personal and medical history and made specific findings about the degree of Freeman's functional limitations.  Therefore, substantial evidence supports the ALJ's conclusion that Freeman suffers from severe mental impairments that do not meet or equal any listed impairment.

C.     **Residual Functional Capacity Assessment**

Freeman next asserts that the ALJ improperly discounted the medical opinions in the record and substituted his own lay opinion in the RFC assessment. (Doc. 9 at 2).  Moreover, Freeman contends that the ALJ failed to develop a full and fair administrative record prior to making his RFC assessment.  (Id.)

i.     *Weight of Medical Opinions*

Pursuant to the social security regulations, an ALJ must evaluate every medical opinion received.  20 C.F.R. §§ 404.1527(c), 416.927(c).  To determine the weight of a medical opinion, an ALJ must first assess whether the opinion is from a treating, non-treating examining, or non-examining source.  See id.  The Third Circuit Court of Appeals has set forth the standard for evaluating the opinion of a treating medical source in Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Third Circuit stated, in relevant part, as follows:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time" . . . . [T]he ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled.  In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion.

Id. at 317-18 (internal citations omitted).  The social security regulations further state that an ALJ should give more weight to the opinions of an examining medical

source than those of a non-examining source.  20 C.F.R. §§ 404.1527(c)(1),

416.927(c)(1).  However, an ALJ is not required to give special treatment to the

opinions of either a non-treating examining source or a non-examining source.  Id.

§§ 404.1527(c), (e), 416.927(c), (e).  An ALJ also need not defer to a medical source's

opinion about the ultimate issue of disability because that determination is an

administrative finding reserved to the Commissioner.  Id. §§ 404.1527(d), 416.927(d);

see Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ . . .

must make the ultimate disability and RFC determinations.").

In the instant case, the ALJ reviewed the medical records and opinions of

Freeman's treating sources, including Raymond Dahl, D.O., Bruce Goodman, M.D.,

Paul J. Baughman, D.O., and Regina Smith, D.O., and examining source, Robin

Miller, M.D.  (See Doc. 8-2 at 20-22).  The ALJ also considered the opinions of

Freeman's therapist, Jovitha Mudacumura, M.S., non-examining consultant, Louis

Laguna, Ph.D., and state agency physician, Carla Huitt, M.D., and psychologist,

Francis Murphy, Ph.D.  (Id. at 23-24).  The court notes that the administrative

record in this case is 1057 pages in length, primarily consisting of medical and

vocational records.  (See Doc. 8).  The ALJ did an excellent job of reviewing

Freeman's background and medical records in his decision.  Furthermore, the brief

submitted by the Commissioner adequately reviews all of the record evidence in

this case.  (See Doc. 10).

### a.   __Physical Impairments__

In assessing Freeman's physical impairments, the ALJ first noted that Dr.

Dahl, an orthpedist, conducted numerous diagnostic tests in 2009. (Doc. 8-2 at 20-

21). Dr. Dahl diagnosed Freeman with degenerative disc disease and bilateral

spondylosis of the cervical spine, as well as mild degenerative changes at certain

levels in the lumbar spine with a stable small disc protrusion. (Id. at 21). An MRI of

Freeman's left knee also revealed a probable tear of the medial meniscus, small

joint effusion, and low grade chondromalacic changes. (Id.) The ALJ observed that

Freeman's musculoskeletal conditions improved significantly when he complied

with prescribed physical therapy under Dr. Goodman. (Id. at 20-21). However,

Freeman was discharged from physical therapy after only a month for failing to

obtain an updated status from Dr. Dahl. (Id. at 21).

Dr. Dahl's treatment notes indicate that Freeman continued to complain

about pain in his neck, back, and left knee in 2009, but he did not seek treatment in

2010. (Id.) In April 2011, Freeman complained to then family physician, Dr.

Baughman, that his pain medication, Vicodin, was not effective for his neck, back,

and knee pain. (Id.) Freeman underwent another series of diagnostic tests, which

showed multilevel spondylitic changes in the cervical spine and only mild

degenerative changes in the lumbar spine. (Id.) Dr. Dahl once again treated

Freeman, but his examination revealed normal posture and gait, neurovascularly

intact bilateral upper extremities with good sensation and distal pulses. (Id.) Dr.

Dahl observed only some tenderness over the paraspinal musculature of the

cervical spine.  (Id.)  Dr. Dahl diagnosed Freeman with severe neural foraminal

stenosis at C3-C4 and C4-C5 and performed a cervical discectomy on May 9, 2011.

(Id.)

The post-surgery medical records indicate that Freeman was doing well and

his pain was markedly improved.  (Id.)  In July 2011, even though his neck was

improving, Freeman reported severe lower back pain radiating down both legs.

(Id.)  The ALJ noted that Freeman had a negative straight leg raising test, and Dr.

Dahl did not order any nerve conduction studies or diagnose radiculopathy.  (Id. at

22).  Nevertheless, Dr. Dahl prescribed aquatic therapy, but Freeman attended only

three sessions before experiencing panic attacks and excessive sleeping from his

medications.  (Id. at 21, 73-74).  In 2012, Freeman again complained of lower back

pain to his new family physician, Dr. Smith, but no further treatment notes exist

from Dr. Dahl.  (Id. at 22).

The ALJ concluded that the objective medical evidence does not support

Freeman's testimony that his physical impairments cause debilitating symptoms for

three reasons.  (Id.)  First, although Freeman suffers from musculoskeletal

impairments, he did not consistently experience symptoms from those impairments

over the period of alleged disability.  (Id.)  The ALJ noted that there are almost no

medical records from 2010 and into 2012 because Freeman did not see an

orthopedist regularly.  (Id.)  Second, the ALJ reiterated that Freeman's condition

seemed to improve when he sought regular treatment, but Freeman was not fully

compliant with treatment.  (Id.)  Finally, the ALJ observed that, despite his

21

degenerative disc disease, none of Freeman's medical sources conducted further diagnostic tests or made additional diagnoses regarding the radiating pain down his arms and legs. (Id.)

The ALJ next considered Dr. Smith's medical source statement, in which she stated that Freeman can lift ten pounds occasionally, sit for fifteen minutes, stand or walk for ten minutes, and occasionally climb ramps and stairs. (Id. at 24). Dr. Smith also opined that Freeman can never perform other postural adjustments or be around unprotected heights and extreme cold. (Id.) The ALJ explained that he gave Dr. Smith's opinion some weight because her lifting restriction is consistent with the objective medical evidence. (Id.) However, the evidence of record as a whole does not support Dr. Smith's opinion that Freeman's condition precludes walking, standing, and postural movements. (Id.) Similarly, the ALJ discounted the opinions of state agency physician, Dr. Huitt, who opined that Freeman could perform light work with no further limitations. (Id.) The ALJ determined that the record evidence supports at least some physical limitations due to Freeman's multiple musculoskeletal impairments. (Id.)

Freeman asserts that the ALJ improperly rejected these medical opinions and substituted his own lay opinion based on a review of the medical records. (Doc. 9 at 2). The court finds this argument persuasive. Upon partially rejecting the medical opinions regarding Freeman's physical impairments, the ALJ created his own set of physical limitations in the RFC assessment. (Doc. 8-2 at 22). Specifically, the ALJ agreed with the existing medical opinions that Freeman is limited to light

work, but that he cannot lift more than ten pounds. (Id.) However, the ALJ then reasoned that Freeman was limited to frequent postural adjustments, but no climbing ladders, ropes, and scaffolds, or concentrated exposure to hazards due to his lower back pain and instability caused by his knee impairments. (Id.) Despite the lack of objective medical evidence, the ALJ also credited Freeman's radiating pain in his arms. (Id.) Accordingly, the ALJ's RFC assessment precludes Freeman from reaching overhead and limited him to frequent reaching in all other directions with both arms. (Id.)

The ALJ did not identify any medical opinion by a treating, examining, or consulting physician which supports his RFC assessment. The court recognizes that a RFC assessment must be based on a consideration of all the evidence in the record, including the plaintiff's testimony and medical records. Burnett, 220 F.3d at 121. However, the RFC determination ordinarily demands an assessment from a physician regarding the plaintiff's functional abilities. See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [plaintiff] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); Kaumans v. Astrue, No. 3:11-CV-01404, 2012 WL 5864436, at *13 (M.D. Pa. Nov. 19, 2012) ("The administrative law judge cannot speculate as to a claimant's residual functional capacity but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his determination.").

23

Moreover, contrary to <u>Morales</u>, the ALJ engaged in his own lay analysis of the medical records and included physical limitations in his RFC assessment unsupported by any medical opinion.  <u>See</u> <u>Morales</u>, 225 F.3d at 318 (noting that an ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of [the plaintiff]'s credibility" (quoting <u>Kent v. Schweiker</u>, 710 F.2d 110, 115 (3d Cir. 1983))); <u>Schmidt v. Sullivan</u>, 914 F.2d 117, 118 (7th Cir. 1990) ("[J]udges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong.").  Therefore, the court concludes that substantial evidence does not support the ALJ's RFC assessment of Freeman's physical impairments.

### b.   **Mental Impairments**

With respect to Freeman's mental impairments, the ALJ first referred to medical records showing that Freeman was hospitalized in December 2009 for suicidal ideations.  (Doc. 8-2 at 23).  Dr. Miller diagnosed Freeman with major depressive disorder, single episode, severe with psychotic features and assessed a GAF[15] score of 20 to 25.  (<u>Id.</u>)  Upon his release, Dr. Miller assessed a GAF score of

---

[15] The GAF score allows a medical source to indicate his judgment of a plaintiff's overall psychological, social, and occupational functioning in order to assess the plaintiff's mental impairments.  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 3-32 (4th ed. 1994).  A GAF score is set within a particular range if either the severity of symptoms or the level of functioning falls with that range.  <u>Id.</u>  A GAF score of 11-20 indicates some danger of hurting one's self or others, such

50 and Freeman attended outpatient counseling sessions very briefly before being

discharged in March 2010 for violating the attendance policy.  (Id.)  Freeman

continued to seek treatment with Dr. Baughman for depression and anxiety.  (Id.)

In October and November 2011, Freeman reported worsening panic attacks and

was taking Xanax to treat his symptoms.  (Id.)  However, Dr. Baughman discharged

Freeman from his care for not complying with the suggested dosage and abusing

Xanax.  (Id.)  In June 2012, Freeman was again hospitalized for taking 6 Klonopin

pills with alcohol.  (Id.)  Dr. Miller made adjustments to Freeman's medications and,

at the time of discharge, she noted that Freeman was looking forward to the future

and no longer had thoughts of harming himself.  (Id.)  Similar to his physical

impairments, the ALJ found that Freeman did not seek regular and continuous

treatment (presumably beyond prescription medication) for his depression and

anxiety.  (Id.)

The ALJ also reviewed Dr. Laguna's observations and opinions from his

consultative examination on July 25, 2011.  (Id.)  Dr. Laguna noted that Freeman

had a depressed mood, but appeared to be overmedicated.  (Id.)  As a result,

---

as suicide attempts without a clear expectation of death, frequent violence, or
manic excitement.  Id.  A GAF score of 21-30 represents behavior considerably
influenced by delusions or hallucinations or serious impairment in communication
or judgment, such as incoherence, grossly inappropriate acts, or suicidal
preoccupation.  Id.  A GAF score of 31-40 shows some impairment in reality testing
or communication, or major impairment in several areas, such as work or school,
family relations, judgment, thinking, or mood.  Id.  A GAF score of 41-50 indicates
serious symptoms or any serious impairment in social, occupational, or school
functioning.  Id.  A higher GAF score represents moderate, mild, or minimal
symptoms or difficulty in social, occupational, or school functioning.  See id.

Freeman had difficulty concentrating at the examination. (Id.) Dr. Laguna diagnosed Freeman with major depressive disorder, recurrent, without a history of psychotic features and assessed a GAF score of 45. (Id.) The ALJ next considered a mental medical source statement completed by Freeman's therapist, Ms. Mudacumura, in May 2012. (Id. at 24). Ms. Mudacumura indicated that Freeman has moderate limitations in his ability to understand, remember, and carry out complex instructions and no limitations for simple instructions. (Id.) However, she attributed these limitations to side effects from his medication. (Id.) Ms. Mudacumura further opined that Freeman is unable to work due to the severity of his symptoms stemming from anxiety and depression. (Id.) The ALJ gave her opinion some weight, but found that Freeman's limitations were not simply attributable to side effects. (Id.) Finally, the ALJ considered the opinions of state agency psychologist, Dr. Murphy, who opined that Freeman can engage in simple, repetitive work and has only moderate limitations in social functioning and concentration, persistence, or pace. (Id.) The ALJ gave this opinion significant weight as consistent with the evidence of record. (Id.) Hence, the ALJ included limitations for simple instructions and tasks, and only occasional interaction with the public, coworkers, and supervisors. (Id.)

The court concludes that the ALJ adequately evaluated all of the medical evidence and opinions in the record regarding Freeman's mental impairments. Because the ALJ determined that the evidence of record does not support the opinions of Ms. Mudacumura, the ALJ properly discounted them in accordance

26

with the applicable social security regulations.  Therefore, the ALJ's reliance on Dr.

Laguna and Dr. Murphy's opinions was appropriate.  See Chandler, 667 F.3d at 362

("Having found that the [state agency physician's] report was properly considered

by the ALJ, we readily conclude that the ALJ's decision was supported by

substantial evidence.").  The court's review of the administrative record as a whole

reveals that substantial evidence supports the ALJ's mental RFC assessment.

### ii.   *Full and Fair Administrative Record*

Freeman further contends, however, that the ALJ did not develop a full and

fair administrative record prior to the RFC assessment.  (Doc. 9 at 2).  In social

security cases, "ALJs have a duty to develop a full and fair record." Ventura v.

Shalala, 55 F.3d 900, 902 (3d Cir. 1995).  The plaintiff nevertheless has the ultimate

burden of producing sufficient evidence to show the existence of a disability.  See

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (stating that the plaintiff is in a better

position to provide information about his or her own medical condition); Hess v.

Sec'y of Health, Educ. & Welfare, 497 F.2d 837, 840 (3d Cir. 1974) (recognizing that,

although an ALJ provides some assistance for disability claims, the ALJ does not

have a duty to search for all of the available relevant evidence because such a

requirement would shift the burden of proof); 20 C.F.R. §§ 404.1512(a)-(c),

416.912(a)-(c).  An ALJ must only ensure that the plaintiff's complete medical

history is developed on the record before finding that the plaintiff is not disabled.

Money v. Barnhart, 91 F. App'x 210, 215-16 (3d Cir. 2004); 20 C.F.R. §§ 404.1512(d),

27

416.912(d).  A complete history is generally defined as records of the plaintiff's

medical sources for at least 12 months preceding when the plaintiff filed the initial

application for disability benefits.  20 C.F.R. §§ 404.1512(d)(2), 416.912(d)(2).  The

ALJ's duty to further develop the record also arises when evidentiary gaps exist

that prejudice the plaintiff, or when the medical records contain a conflict or

ambiguity that must be resolved.  Money, 91 F. App'x at 216; Smith v. Astrue, 961 F.

Supp. 2d 620, 645 (D. Del. 2013); Gauthney v. Shalala, 890 F. Supp. 401, 410 (E.D. Pa.

1995); Jozefick v. Shalala, 854 F. Supp. 342, 348 (M.D. Pa. 1994).  Absent such

circumstances, further development of the record is not required.  Smith, 961 F.

Supp. 2d at 645.

    In the instant action, Freeman argues that "[n]o medical records were every

[sic] requested from my treating Physician, Psychologist, Pulmonary's [sic], and

Psychotherapist."  (Doc. 9 at 2; see also Doc. 11 at 10-11).  Freeman specifically

names the following medical sources: Dr. David Timme, Ms. Mudacumura, Mr.

Norman Stovall, Dr. Smith, Dr. Eckenrode, and Dr. Leon Sweer.  (Doc. 9 at 2).  As

an initial matter, the court notes that the 1000-page administrative record includes

detailed medical records from many of these sources.  (See Doc. 8-12, Exs. 29, 32F,

33F, 34F).  Moreover, Freeman was represented by counsel at all stages of his

disability application, including the hearing before the ALJ and his appeal to the

Appeals Council.  (See Doc. 8-2 at 7, 14).  At the hearing, Freeman's attorney stated

that he had reviewed the record and confirmed that "it is complete."  (Id. at 36).

The court concludes that the ALJ fulfilled his duty to develop a full and fair record regarding Freeman's mental impairments.  The ALJ obtained records from Freeman's medical providers, including his therapist's RFC assessment, ordered a consultative examination, and received a state agency expert's RFC assessment. See Carmichael v. Barnhart, 104 F. App'x 803, 805 (3d Cir. 2004).  There is simply no evidentiary gap or conflict to be resolved within the administrative record.  To the extent other medical evidence existed at the time of the ALJ's decision, Freeman had every opportunity to submit such evidence, but he failed to do so.  The ALJ had no further duty to develop the record when Freeman did not meet his own burden of producing the evidence.  See Purnell v. Astrue, 662 F. Supp. 2d 402, 409 (E.D. Pa. 2009).

However, in his assessment of Freeman's physical impairments, the ALJ rejected the existing medical opinions of treating physician, Dr. Smith, and state agency medical expert, Dr. Huitt.  As a result, the administrative record does not contain any medical opinions in support of the ALJ's physical RFC assessment.[16] Therefore, the ALJ had a duty to further investigate Freeman's limitations from his physical impairments.  See Doak, 790 F.2d at 29; Kaumans, 2012 WL 5864436, at *13.[17]

---

[16] The administrative record shows that treating sources, Dr. Baughman and Dr. Dahl, received medical source statement forms, but that neither physician completed the forms.  (See Doc. 8-9 at 566-67, 585-86).

[17] Upon remand, the court notes that the ALJ may be subject to a heightened duty to develop and full and fair record if Freeman remains unrepresented.  See

**V.**     **Conclusion**

For the foregoing reasons, the court will grant Freeman's appeal and remand

the case to the ALJ for further proceedings consistent with this memorandum.

An appropriate order will issue.

                                        /S/ CHRISTOPHER C. CONNER
                                        Christopher C. Conner, Chief Judge
                                        United States District Court
                                        Middle District of Pennsylvania

Dated:          March 31, 2014

---

Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003) (stating that, when a plaintiff is
unrepresented, "the ALJ must 'scrupulously and conscientiously probe into,
inquire of, and explore for all the relevant facts.'" (internal citations omitted)); Rosa
v. Colvin, 956 F. Supp. 2d 617, 621-22 (E.D. Pa. 2013); Comiskey v. Astrue, No. 09-
0252, 2010 WL 308979, at *5 (E.D. Pa. Jan. 27, 2010) ("The Third Circuit repeatedly
has recognized that an ALJ must 'assume a more active role when the claimant is
unrepresented.'" (citing Dobrowolsky, 606 F.2d at 407)).